**Gregory MINGO, Petitioner–Appellant,**

**v.**

**Christopher ARTUZ, Supt. Greenhaven Corr. Facility, Respondent–Appellee.**

**No. 1390, Docket 97–2462.**

United States Court of Appeals, Second Circuit.

Argued March 20, 1998.

Decided April 05, 1999.

Philip L. Weinstein, The Legal Aid Society, New York, N.Y., for Petitioner–Appellant.

Cheryl Hone, Assistant District Attorney, Kew Gardens, N.Y. (Richard A. Brown, District Attorney, Queens County, and John M. Castellano, Assistant District Attorney, Kew Gardens, N.Y., Of Counsel), for Respondent–Appellee.

Before: JACOBS, LEVAL, and GIBSON,* Circuit Judges.

LEVAL, Circuit Judge:

Petitioner Gregory Mingo appeals from an order of the United States District Court for the Eastern District of New York (Johnson, *District Judge*) denying his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Mingo contends that his Sixth Amendment right of confrontation was violated at trial, but concedes that his appellate counsel's failure to raise the issue on direct appeal resulted in

* The Honorable John R. Gibson of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

procedural default. He contends that the cause for the default was either that his Confrontation Clause claim did not reasonably exist in the New York courts at the time of the direct appeal, or that his appellate counsel was ineffective in failing to raise it. We vacate the judgment of the district court and remand for consideration of (i) whether Mingo's rights under the Confrontation Clause were violated by the receipt against Mingo of hearsay testimony of a codefendant's implication of Mingo, (ii) whether Mingo forfeited this claim by failing to raise it on his direct appeal, and (iii) whether any violation of Mingo's rights under the Confrontation Clause substantially and injuriously affected the jury's verdict so as to require vacating the conviction.

## BACKGROUND

Mingo, Willie Holmes, and Susan King were charged in 1981 with the September 1980 robbery and murder of James Parker and Karen Sheets. King cooperated with the People and became a witness against Mingo and Holmes.

The People's evidence included testimony by Paul Perry to the effect that Holmes had told him how he and Mingo murdered Parker and Sheets. The evidence also included King's testimony that Mingo had told her how he and Holmes had murdered Parker and Sheets.

The cases of Mingo and Holmes were consolidated for trial. *Id.* Mingo moved for a severance under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), to avoid prejudice from the receipt of admissions by Holmes that implicated Mingo. The trial court denied the motion on the basis of New York's "interlocking confessions" doctrine as stated in *People v. Berzups,* 49 N.Y.2d 417, 426 N.Y.S.2d 253, 402 N.E.2d 1155 (1980), and *People v. McNeil,* 24 N.Y.2d 550, 301 N.Y.S.2d 503, 249 N.E.2d 383 (1969). Because Holmes's admissions mirrored the admissions by Mingo, the trial judge found that the potential prejudice resulting from Mingo's jury hearing Holmes's admissions (implicating Mingo) was overcome. *See* Transcript of Hearing of August 31 and September 1, 1992, ("Hearing") at 3–4. Prior to trial Mingo objected to the receipt against him of Holmes's admissions. *See* Hearing at 4–6. The trial judge denied the motion, ruling that the testimony would be received against Mingo.

A first joint trial ended in a hung jury for both defendants. At the second joint trial, Mingo and Holmes were convicted of murder, robbery, and related crimes.

On direct appeal, Mingo did not raise the issue of the receipt of Holmes's hearsay declaration. His contentions were that the second trial had placed him in double jeopardy, that trial counsel was constitutionally ineffective, and that the trial court should have not polled the first divided jury to determine the division of voting. The Appellate Division affirmed his conviction without opinion, *see People v. Mingo,* 101 A.D.2d 1031, 475 N.Y.S.2d 964 (2d Dep't 1984), and the Court of Appeals denied his application for leave to appeal. *See People v. Mingo,* 63 N.Y.2d 948, 483 N.Y.S.2d 1031, 473 N.E.2d 48 (1984).

About three years later, the Supreme Court decided *Cruz v. New York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), in which it rejected New York's "interlocking confessions" exception to *Bruton. Id.* at 193, 107 S.Ct. at 1719. In February 1993, relying on *Cruz,* Mingo moved in the New York Supreme Court, Queens County, to set aside his conviction on the ground that the exposure of his jury to Holmes's declaration at the joint trial violated his rights under *Bruton.* The motion was denied on the ground that the claim was procedurally barred by Mingo's failure to raise it on direct appeal. The Appellate Division denied leave to appeal. Mingo then petitioned the Appellate Division for a writ of error *coram nobis,* claiming ineffective assistance of counsel on his direct appeal. The Appellate Division de-

nied Mingo's application, and the Court of Appeals denied Mingo's application for leave to appeal.

On September 20, 1994, Mingo petitioned the district court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, contending that the admission of Holmes's declaration against him in his trial violated his confrontation right and that his counsel's failure to raise this issue on direct appeal constituted ineffective assistance. The district court denied the petition but certified appealability. The court found Mingo's failure to bring a *Bruton* claim on direct appeal was not excused by cause. It reasoned that, while the failure of counsel to raise the *Bruton* issue on direct appeal fell below an "objective standard of reasonableness," *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), there was no prejudice because raising the issue would not have changed the result of the appeal under New York's interlocking confessions rule. *Mingo v. Artuz,* 1997 WL 285024 at *5–6 (E.D.N.Y. May 22, 1997).

## DISCUSSION

We remand for reconsideration. Perhaps because Mingo was acting *pro se* at the time, the district court failed to focus on the key claim raised in his petition. Based on Mingo's *pro se* presentation to the district court, the district judge believed the issue involved the problem considered in *Bruton,* the New York interlocking confession cases, and *Cruz*—that is: the prejudice to a defendant arising from the receipt in a joint trial of a non-testifying codefendant's confession solely against the codefendant, where the confession also implicates the defendant. *Bruton* ruled that, in these circumstances, instructions to the jury limiting its consideration of the confession to the case of the confessing codefendant were incapable of protecting the defendant from prejudice. *See* 391 U.S. at 126, 88 S.Ct. at 1622. The New York interlocking confession cases ruled that the prejudice found in *Bruton* would not occur if the codefendant's statements implicating the defendant were mirrored by the defendant's own confession; thus, in New York, each confession could be received in the joint trial against the defendant whose confession it was, with proper limiting instructions. *See, e.g., People v. McNeil,* 24 N.Y.2d 550, 552–53, 301 N.Y.S.2d 503, 504, 249 N.E.2d 383 (1969). Finally, however, in *Cruz* the Supreme Court rejected New York's interlocking confession exception to *Bruton,* ruling that, notwithstanding the defendant's own interlocking confession, limiting instructions were incapable of protecting him from the prejudice resulting from his codefendant's confession implicating him. *See Cruz,* 481 U.S. at 191–93, 107 S.Ct. at 1717–19.

In response to the State's contention that Mingo forfeited the *Bruton* claim by failing to raise it on his direct appeal, Mingo argues that the failure was excused either because New York's adherence to the interlocking confessions exception deprived him of any remedy for his *Bruton* claim at the time of his direct appeal, or because his counsel's failure to raise the *Bruton* claim on direct appeal constituted ineffective assistance.

In our view, however, the key issue raised by Mingo's petition was slightly but significantly different from the issue on which the district court ruled. At trial, Holmes's declaration was received not only against Holmes, but also against Mingo. Consistent with that ruling, no limiting instructions were given. The constitutional issue that arose from Mingo's trial was therefore not whether, in the interlocking confession situation, limiting instructions were adequate to protect the defendant from the receipt of the non-testifying codefendant's confession solely against the codefendant. It was a much simpler issue: whether Mingo's rights under the Confrontation Clause were abridged by the receipt of Holmes's declaration *against Mingo,* where Mingo had no opportunity to cross-

examine Holmes. Mingo's habeas corpus petition raises this issue.

This was not the problem considered in *Bruton*, in the New York interlocking confession cases, or in *Cruz*. The New York interlocking confessions doctrine did not authorize such admission of one defendant's confession as evidence against another defendant. *See, e.g., People v. McNeil,* 24 N.Y.2d at 552, 301 N.Y.S.2d at 504, 249 N.E.2d 383 (noting that codefendants' confessions were received in evidence with clear, forceful limiting instructions that each confession should be considered only against the declarant); *People v. Safian,* 46 N.Y.2d 181, 184, 413 N.Y.S.2d 118, 119–120, 385 N.E.2d 1046 (1978) (same). At the time Mingo was tried and at the time counsel filed his direct appeal, the receipt of a non-testifying defendant's confession as evidence against another defendant was ordinarily understood to be impermissible irrespective of *Bruton, see Bruton,* 391 U.S. at 128 n. 3, 88 S.Ct. at 1623–24 n. 3, and irrespective of the New York cases establishing an exception to *Bruton* for interlocking confessions.

The question whether Mingo should benefit from a finding of cause under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), and/or *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), for his failure to raise his claim on direct appeal from his conviction, is therefore significantly different from the question on which the district court ruled. Accordingly, we remand to the district court for reconsideration.

Among the questions to be considered on remand are whether the trial court's receipt of Holmes's confession *as evidence against Mingo* violated Mingo's constitutional rights, and whether Mingo's failure to raise *this* issue on his direct appeal constituted a waiver that bars its consideration by the federal courts in a petition under 28 U.S.C. § 2254.

On the waiver question, because New York's interlocking confessions rule did not purport to authorize the receipt of a non-testifying codefendant's confession *as evidence against the defendant,* both of Mingo's claims previously argued in relation to the *Bruton* question—first, that the argument was not reasonably available to him in New York at the time, and second, that if it was available, counsel's failure to raise it amounted to ineffective assistance—will be seen in a different light.

On the question of violation of the Confrontation Clause, the State argues that remand would be futile in view of our holdings in *United States v. Matthews,* 20 F.3d 538, 544–46 (2d Cir.1994), and *Latine v. Mann,* 25 F.3d 1162, 1166–67 (2d Cir. 1994). In both of those cases, we upheld a conviction where the prosecution had introduced testimony of a social friend of a codefendant recounting conversations in which the codefendant admitted his participation in the crime and named the defendant as a co-participant. In both cases the declarant was unavailable for cross-examination because of his privilege against self-incrimination. The court concluded in both cases, upon consideration of all the circumstances, that the particular hearsay statements had sufficient indicia of reliability that their receipt did not violate the Confrontation Clause. Among the factors we considered in these cases as bearing on reliability were that the declarants did not seek to minimize their own guilt or place primary responsibility on the defendants. Furthermore, since the statements were made to friends and not to law enforcement, they were not impeachable as efforts to diminish punishment through cooperation.

The State points out that Holmes's statement to Perry had much in common with the hearsay statements in *Matthews* and *Latine.* The statements were made to a social friend. The declarant admitted his guilt and made no effort to diminish his own responsibility. Nor did the statements represent any kind of effort to gain credit with law enforcement authorities through cooperation. The State asks us to

rule, in effect, that *Matthews* and *Latine* have created a *per se* rule to the effect that a declaration by a criminal, made to a friend, admitting the declarant's participation in a crime and naming a third person as a co-participant, without effort to diminish the declarant's responsibility by increasing that of the third person, is so inherently reliable as evidence of the third person's guilt that such hearsay may constitutionally be received to convict the third person of the offense, notwithstanding his inability to cross-examine the declarant. The State contends we have ruled that such hearsay, like a declarant's admission against his own penal interest, is so reliable that absence of opportunity to cross-examine the declarant represents no meaningful deprivation.

We reject the suggestion that the *Matthews* and *Latine* opinions establish any such *per se* rule. Both opinions made clear that the question whether the portion of the declaration inculpating the defendant was sufficiently trustworthy to be admissible without need for cross-examination was to be assessed on the "totality of the circumstances." *Matthews*, 20 F.3d at 545–46; *Latine*, 25 F.3d at 1167 ("under all the circumstances"). There would be no conceivable justification for a rule or presumption that statements made by criminals exhibiting the listed characteristics are inherently reliable. The argument made by the State for such a rule seems to assume that criminals are strongly inclined to truthfulness and would be motivated to lie only to diminish their own responsibility or to reduce their sentences. This view seems far off the mark. To begin with, habitual criminals are not an element of society that is particularly committed to truthfulness. We believe, furthermore, that a criminal may have many motivations to lie while naming accomplices in a conversation with a friend or ally, in addition to those emphasized in *Matthews* and *Latine*. For example, because criminals are constantly at risk that loose talk may result in their loss of freedom, and because their friends might at the moment or in the future be under pressure to cooperate with the law, it is undoubtedly a serious breach of etiquette in the criminal world (no doubt punishable by harsh measures) to reveal one's accomplices—even to friends. Those who cannot resist boasting, or confiding to a friend, about their own crimes, may well be loath to identify their accomplices truthfully and may well substitute the names of people from whom they have nothing to fear in place of those from whom they have much to fear, or in place of those whom loyalty would bar naming. In addition, far from wishing to diminish his own participation, a criminal may boastfully exaggerate his own exploits, falsely claiming complicity in a criminal venture with a powerful respected leader in the criminal world. According to the *per se* rule advocated by the State, convictions could be obtained supported by nothing more than that unreliable hearsay, and the defendants would have no opportunity to cross-examine the maker of the incriminating declarations.

In short, we reject absolutely the State's suggestion that a criminal confidence to a friend, admitting guilt and naming an accomplice without seeking to diminish the declarant's responsibility, is *per se* so inherently trustworthy as evidence of the guilt of the named accomplice that it satisfies the Confrontation Clause. There is no such *per se* rule. A court must carefully examine each instance of incriminating hearsay in the light of all the circumstances, taking care to consider all reasonable motivations of the declarant to lie, before concluding that such evidence is so reliable that the defendant had no constitutional right of confrontation. That was our approach in *Matthews* and *Latine*. On remand, the district court should undertake a detailed analysis of all the circumstances of Holmes's admission to Perry to decide whether its inculpation of Mingo was so inherently trustworthy that it did not require giving Mingo the opportunity to cross-examine Holmes pursuant to the Confrontation Clause.

■ If the district court concludes that Mingo's rights under the Confrontation Clause were violated by the receipt against Mingo of Perry's report of Holmes's narration, and that the issue was not waived by Mingo's failure to raise it on direct appeal, the district court should further consider whether that violation calls for vacating Mingo's conviction. The Supreme Court clarified in *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), that a habeas corpus petition should not be granted unless the violation of constitutional rights had "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637, 113 S.Ct. 1710 (internal quotation marks and citation omitted). We note that the district court has already considered this question in ruling on the grant of a certificate of appealability. The court concluded that the effect of the hearsay declaration was substantial because in the district court's view, without the Holmes hearsay, the case against Mingo would have been legally insufficient. Reconsideration of this question is required because, in our view, the district court did not properly consider all the evidence against Mingo. The court mentioned Susan King's testimony, but observed that, because she was an accomplice, New York law required corroboration "tending to connect [Mingo] with the commission of [the] offense." N.Y.C.P.L. § 60.22. Finding little or none, the district court evidently concluded that without Perry's report of the Holmes declaration, the case would have to be dismissed.

■ We disagree. The requirements of New York's corroboration rule are not severe. "The corroborative evidence need only tend to connect the defendant to the crime; it need not establish all the elements of the offense. Seemingly insignificant matters may harmonize with the accomplice's narrative so as to provide the necessary corroboration." *People v. Steinberg,* 79 N.Y.2d 673, 683, 584 N.Y.S.2d 770, 595 N.E.2d 845 (1992), 79 N.Y.2d 673, 584 N.Y.S.2d 770, 774, 595 N.E.2d 845 (1992) (internal quotation marks and citations omitted).

King's testimony was amply corroborated by evidence connecting Mingo to the crimes. Perry testified that Mingo had asked his advice as to whether he and Holmes should rob Parker. Perry also testified that after the time of the murder he spent a night in the company of Holmes and Mingo during which both had boasted obliquely about having committed a robbery-murder.

Further corroboration of King's testimony was as follows: King testified that at Mingo's and Holmes's instigation she had lured Parker to her garage in Lefrak City in Queens where Mingo and Holmes were hiding to ambush and rob him, that after entering the garage in Parker's car around 2:00 a.m., she quickly exited, and that as she was leaving, she heard a shot behind her. About two hours later, Mingo telephoned her and told her that they had taken Parker elsewhere, that Holmes had killed him by shooting him in the head, and that they had taken his money and jewelry.

This testimony was corroborated by the police discovery of Parker's body a few hours later in an alleyway in Queens, hands and feet tied, shot in the head, and stripped of money, jewelry and identification. No spent ammunition was found in the vicinity of the body.

King testified further that Mingo had called her again later in the day and told her that after Holmes killed Parker, he and Holmes had gone to rob Parker's apartment, that they had found a girl inside and that they had strangled her.

This evidence was corroborated by the police evidence that, after finding Parker's body and identifying him by his fingerprints, the police went to his apartment and there found the body of Karen Sheets on Parker's bed, face down, arms and legs tied, and strangled with a wire hanger.

This was more than enough corroboration to satisfy the requirements of New York law. We are satisfied that the case against Mingo would not have been vulnerable to dismissal without Perry's testimony about Holmes's implication of Mingo.

Because of the district court's mistaken view that absent the Holmes declaration, there was no corroboration of King's testimony against Mingo, the court did not consider the force of King's testimony in deciding whether the receipt of the Holmes hearsay had a substantial and injurious effect on Mingo. The district court should therefore reconsider that question, taking full account of King's testimony.

## CONCLUSION

The judgment is vacated and the case remanded to the district court for consideration whether the receipt of Perry's testimony relating Holmes's implication of Mingo violated Mingo's rights under the Confrontation Clause; if so, whether Mingo waived the claim by failing to raise it on appeal; and whether that violation had a substantial and injurious effect on the jury's verdict.